**UNITED STATES ex rel. TENNESSEE VALLEY AUTHORITY v. SOUTHERN STATES POWER CO. et al.**

District Court, W. D. North Carolina, Asheville Division.

May 15, 1940.

Wm. C. Fitts, Jr., General Counsel, of Knoxville, Tenn., and Melvin H. Siegel Attorney, of Washington, D. C. (Henry H. Fowler and S. Frank Fowler, both of Knoxville, Tenn., of counsel), for petitioner.

Isidor J. Kresel of New York City, and G. L. Jones, of Asheville, N.C., for respondents.

Before WATKINS, WEBB, and PAUL, District Judges.

PER CURIAM.

Pursuant to the provisions of the "Tennessee Valley Authority Act", passed by Congress May 18, 1933, 16 U.S.C.A. § 831 et seq., the United States of America, upon the relation and for the use of the Tennessee Valley Authority, filed its petition in the District Court of the United States for the Western District of North Carolina on January 28, 1936, to condemn the lands and property of the respondents therein described.

After the docketing of this action, and before hearing was had thereon, the Court, pursuant to section 25 of said act, appointed a Commission, composed of O. M. Mull, A. R. Bauman, and J. K. Cowan, to personally inspect the property, take testimony, and, pursuant to law, find the value of the property condemned and ascertain the damage, if any, that resulted from the taking, to the remainder of the respondents' property not taken, and make report to the Court of its award and findings.

The Commission met on October 3, 1938, and personally visited and inspected all the properties and the various tracts of land that constitute the subject matter of this suit. After making a personal inspection, the Commission convened in Asheville and for approximately three months heard testimony and argument by and in behalf of the petitioner and the respondents.

Approximately 500 exhibits were filed by the several parties to the action, and 6,000 pages of testimony were taken. The Commission, on May 12, 1939, made and filed its final report, together with all exhibits and copies of testimony.

In the hearing before us it was agreed by both sides that we should receive in evidence, subject to objection duly made, all the testimony taken before the Commissioners.

We have, subject to the exceptions, given most careful consideration to this report of the Commissioners, and have checked their findings in every particular. In order to understand and appreciate this report it was necessary carefully to study the evidence presented to the Commissioners in every detail, and it is but fair to state that we regard the report as a most admirable one in every respect. While there was a large amount of additional evidence taken before us, it related almost entirely to facts and issues which had already been elaborately developed before the Commissioners. In two respects in particular the Commissioners enjoyed a definite advantage over this Court in the consideration of the evidence. In the first place, before they began the taking of testimony they carefully went over and personally inspected all the properties involved in this controversy, and, in the second place, the witnesses, whose testimony was taken during the continuous three months of that hearing, gave their testimony in person. It is no small tribute to the Commissioners' accuracy, fairness and ability that the values placed by them upon the rights of way, mineral rights, reversions, and the fees in approximately 80 tracts of land have been accepted and approved by both condemnor and condemnees, and also that the valuation placed by the Commissioners upon the Murphy Power Plant of the Southern States Power Company has been agreed to by the parties.

Notwithstanding our respect for the judgment of the Commissioners, based upon what appeared to us to be a thorough consideration of the whole matter, yet, in deciding the matters remaining in controversy, we have arrived at our award without regard to the amounts of the awards made by the Commissioners.

The Commission found:

1. The value of all the land condemned was $1,437,000.

2. The value of the small Murphy Hydroelectric Plant was $110,000.

3. The damage resulting to the remainder of respondents' property, from the taking of a part thereof, was $253,000.

The Commission also found the individual value of a large number of small tracts of land.

Both the petitioner and the respondents filed exceptions to the awards and report of the Commissioners. A trial was had before us as a three-judge court, composed of Judges WATKINS, WEBB and PAUL, in Asheville, N. C., beginning on September 10, 1939, and extending through September 19. At said hearing before us approximately 800 pages of additional oral testimony were taken, and numerous additional exhibits were filed by both parties, and lengthy oral arguments were heard for two days, the record of which embraces 250 pages. Also, elaborate written briefs were filed with us by both sides, with citation of numerous authorities; all of which we have carefully examined, with such additional legal investigation as we considered necessary. The review of the testimony and consideration of the briefs necessarily consumed a great deal of time and delayed the filing of this judgment.

Both the petitioner and the respondents withdrew their exceptions to the award of the Commissioners of $110,000 for the small Murphy Hydroelectric Plant, and to the value of the small individual tracts of land as found and reported on pages 14 and 15 of the Commissioners' Report, and said parts of the Report of the Commissioners are hereby adopted as the judgment of this Court.

The property which the petitioner seeks to condemn consists of approximately 12,-679.94 acres of land located in Cherokee county. It is situated on both sides of the Hiwassee river, beginning at a point about twelve miles upstream from the Tennessee-North Carolina state line, and extending up the Hiwassee river about 23 miles to the town of Murphy. This land is either contiguous or adjacent.

About 8,208.94 acres of this land is very rough and rocky mountain lands. A large variety of timber is growing on same, but the majority of it has been cut over. This 8,208.94 acres is not adapted to use as farm lands. A large per cent of the surface is rocky and very rough mountain peaks and gorges. Of the remaining 4,471 acres, 2,000 acres are cleared and are now, or have been, cultivated as farm lands. The balance of approximately 2,471 acres is located adjoining the cleared lands and included the low edges of the mountains. This 4,471 acres is located immediately along and on the Hiwassee river or its tributaries, and all of said 4,471 acres is now or will be inundated by the waters impounded by the dam erected or being erected by the Tennessee Valley Authority on the Hiwassee river at the Powelson dam site; but we are considering only the status of the property at the time the petition was filed, January, 28, 1936.

The petitioner contends that the property it seeks to condemn possesses only such value as is incident to it as farm lands, with minor enhancement from the timber and other appurtenances and visible improvements thereon, and that the same constitutes the most valuable use to which it is adaptable; and that it is worth only from $97,000 to $146,000. The respondent, Southern States Power Company, contends that its property is adapted to, and is usable as, a site for a large hydroelectric power development consisting of an integrated system with three dams or units on the Hiwassee river, and one on the Nottely river, which is a tributary of the Hiwassee. It contends that its property is so constituted and so situated that it can be used for the site for four dams—a dam 110 feet high on the Hiwassee river at a point in North Carolina near the Tennessee line, which it designates Appalachia dam; a second dam 245 feet high about twelve miles up the Hiwassee river from the first, which it designates as Powelson dam (the site being used for the location of the TVA dam now under construction); a third dam 200 feet high on the Hiwassee river near the town of Murphy; and a fourth dam 200 feet high on Nottely river, a tributary of Hiwassee river.

The Southern States Power Company contends that, in such an integrated system of four dams, each would be of valuable assistance to the other, since the upstream dams could store the water during rainy seasons and release same during dry seasons, and that the adaptability of its property to such a use greatly enhances its value. The Southern States Power Company contends that the use of its property as the site of such an integrated hydroelectric power system would be very profitable, and that its property has a value of $7,500,000 for said use. It presented much evidence of electrical engineers, and many charts, logs and tabulations, to establish the quantity of hydroelectric power that the water in said rivers is capable of producing under plans it formulated and presented. It likewise offered the testimony of contractors of extensive training and experience relative to the cost of such dams and

equipment, and alleged same to be approximately $30,000,000.

This testimony relates to the adaptability of the property in question for use as the site of an integrated hydroelectric power system, and its effect is limited to said question.

The petitioner contends that, while admitting that said property could be used as the site for an integrated hydroelectric power system, (1) the cost of constructing such a system would be from $42,000,000 to $56,000,000; (2) that such a system, when constructed, would produce far less electrical energy than that claimed by the respondent; (3) that said property is located in a territory in which there is but little demand for electrical power, and in a section in which a large amount of other sites is available; (4) that no sale could be made of the power generated unless it was transmitted many miles to the industrial districts of the South; and (5) that said property has no value as the site of a hydroelectric plant or system.

The Court finds as a fact that the land in question can be used as the site of a hydroelectric power plant and is suitable for said purpose. The Court further finds as a fact that the Southern States Power Company, through much expensive engineering and surveying, and many years of expensive litigation, asserted its *prior right* to develop the water powers upon the Hiwassee and Nottely rivers in the state of North Carolina, which not only added to the possibility of its projected enterprise, but constituted a valuable right, which is destroyed by this condemnation proceeding. The Court further finds that the employment of said property as the site for a hydroelectric power plant furnishes the use or basis for the greatest value inherent in the property. In making said finding, the Court finds:

1. That the Hiwassee river furnishes a reasonably large volume of water;

2. That it is supplied by a large watershed;

3. That it is located in a territory of great rainfall;

4. That its rainfall is dependable, as shown by Government records kept continuously for more than fifty years;

5. That there is an excellent shoal in the Hiwassee river at the point where the Tennessee Valley Authority is now con-structing a 250 foot dam on the land being condemned;

6. That the topography of the land above the dam constitutes a large basin for the storage of water; and

7. That the Hiwassee river, as it passes through the territory in question, has a great fall in elevation—decidedly greater than that of the average stream used to generate hydroelectric power.

The Tennessee Valley Authority is now erecting a 250-foot dam on said shoal. The shoal has been completely explored. The construction of the dam has been completed through the initial stages that would expose the weakness of the shoal or its unfitness, and the project is structurally a success. The site is well suited for said purpose.

Much evidence was presented by both parties relative to the necessary cost of erecting the contemplated dam at the site now being used by the Tennessee Valley Authority, and the dams at the other three sites proposed by the Southern States Power Company.

The construction of a modern hydroelectric power plant on a large stream is a very expensive undertaking. The original cost is very high, but the cost of maintenance is very low. This condition is common to the industry, and after carrying the burden of the high cost of the original construction, hydroelectric generating plants have proved profitable, and constitute one of the great industries of the United States. The sites for such plants possess value, for which the 5th amendment to the Constitution of the United States requires the payment of "just compensation" to the owner when his property is condemned by the Government. The Court finds that there is nothing that would make the cost of constructing the proposed dams peculiarly expensive, or more expensive than the average cost incident to such developments. But there are a number of favorable conditions that should aid in keeping the cost of the original construction of the proposed dams low in comparison with many other similar developments. A few of said conditions consist of (1) a surplus of dependable and efficient labor in the local community, (2) efficient railroad service in close proximity to the proposed sites, (3) narrow gorges at the proposed sites; i. e., the mountains come in close to the banks of the river at the proposed sites, which lessens the amount

of artificial construction required to form the dams.

Much testimony was presented pro and con relative to the existence of a market for additional electric power, or a market for sites for new generating plants. It is a fact that the use of electrical energy is expanding, and the years ahead will require increasingly large amounts. Sites for the erection of hydroelectric generating systems are constantly being purchased, and the growing need and the expanding uses for electricity warrant a finding that a market exists for the property of the respondents for such use. After giving proper allowance for the advantages the Court finds the proposed sites to possess, and after discounting same for the disadvantages the Court finds to be inherent in the property, a balance still exists in favor of the use of the property as the site of an integrated hydroelectric system. Private companies have purchased sites and developed similar hydroelectric generating plants in the same immediate locality at Ocoee No. 1, about 15 miles, and at Ocoee No. 2, about 20 miles, from the property in question.

■ In fixing "just compensation", prescribed by the Constitution of the United States, the Supreme Court of North Carolina has held, in the case of Brown v. Power Company, 140 N.C. 333, 52 S.E. 954, 957, 3 L.R.A.,N.S., 912, the following: "In estimating its value all the capabilities of the property and all the uses to which it may be applied or for which it is adapted may be considered, and not merely the condition it is in at the time and the use to which it is then applied by the owner."

The general principles announced in the foregoing opinion are in accord with the rules laid down in Mississippi & R. R. Boom Co. v. Patterson, 98 U.S. 403, 25 L. Ed. 206; Monongahela Navigation Co. v. United States, 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463, and many subsequent decisions of the Supreme Court of the United States.

■ The owner may be cultivating a vacant lot in the heart of a large industrial city. In fixing the value of such a lot under condemnation, consideration should not be limited to the adaptability of the lot to a production of vegetables, cotton or other crops to which it is then applied, but its adaptability to industrial and commercial use by reason of its location in the heart of a large city should be given consideration in arriving at its value. In like manner, in arriving at "just compensation" to be awarded the respondents for the land in question, the respondents are entitled to have considered, as elements of value, its use as the site for an integrated hydroelectric generating system, for which the Court finds it adaptable.

It appears from Exhibit R–20, and the Court finds, that a competent engineer, Mr. Krickhan, was engaged in surveying the dam site and the Hiwassee river basin, that constitute the subject matter of the action, during the years 1931, 1932, 1933, and 1934. A survey was actually made upon the ground, and all contour lines throughout the whole property in question were developed at intervals of 10 feet in height below the 1,520-foot contour line, down to the 1,440 foot contour line. It appears from Exhibits R–8, R–20, and R–257 A, and the Court finds, that the dam site and the flooded basin above same consist of approximately 5,700 acres. That is, the dam site and the surface of the land above same that will be covered by water impounded by a dam 250 feet high, at the site now being developed by the TVA, comprise approximately 5,700 acres of land. This is the acreage that is adaptable to use as the site of a hydroelectric generating plant at said location. To this acreage, and only to same, is given a value based upon its use as the site of a hydroelectric generating plant. The respondents own only 4,471 acres of this proposed site. Said 4,471 acres represent 78½% of the total site, consisting of 5,700 acres. The Government has taken all of said 4,471 acres belonging to the respondents, and in addition thereto has taken approximately 8,029 acres belonging to respondents and adjoining same and extending into the foothills of the adjacent mountains. Since the institution of this action on January 28, 1936, the Government, for the use of the Tennessee Valley Authority, has purchased from other private owners 9,500 acres of land, which lands include the remaining 21½% of said power site of approximately 1,229 acres, and in addition thereto approximately 8,271 acres adjoining the same and extending up into and on the adjacent mountains.

The purchases made by the respondents the Southern States Power Company, beginning in the year 1909 and extending up to January 28, 1936, and the purchases made by the Tennessee Valley Authority, beginning January 28, 1936, and extending

up to and through 1939, constitute approximately the only sales and purchases of land in the immediate locality during recent years. The cost to the Southern States Power Company of the lands it acquired, including cost of engineering and surveying but without interest or salaries, aggregated more than a million dollars. It appears from Exhibit 3–L, and from the testimony before the Commission in this action, and the Court finds, that the Government has since January 28, 1936, paid $396,894.79 for 9500 acres that include 1,229 acres in the power site and the 8,271 acres of mountain land adjoining same. These purchases made by the Tennessee Valley Authority are of recent date and were consummated by private negotiation and through agreement with many individual land owners. These purchases consist of many small tracts, part of which are completely surrounded by the land of the Southern States Power Company, that are being condemned, and the remaining tracts adjoin or are adjacent to the same. These tracts privately purchased by the Government are scattered through the Hiwassee river basin, and the character of said land and its location are very similar to the lands of the Southern States Power Company which the Government condemns by this suit.

Upon all the facts found, after giving due consideration to the whole matter before the Court, we find the value of the 4,471 acres of land belonging to the Southern States Power Company, and included in the proposed dam site and in the site of the proposed power development as herein described, to be $200 an acre, or the sum of $894,200, and we find the value of the remaining 8,208.94 acres of rough mountain land adjoining same to be $10 an acre, or $82,089.40. We therefore find the value of the approximately 12,679.94 acres of land, being all of the land belonging to the Southern States Power Company which is being condemned by this action, to be $976,289.40. If the Government had used the same value per acre here fixed for the land it purchased by voluntary agreement with the individual land owners, it would have paid $200 an acre for the 1229 acres in the power site or the sum of $245,800, and it would have paid the sum of $10 an acre for the remaining 8,271 acres of rough mountain land, or the total of $82,710 for same. On this basis the Government would have paid $328,510 for the 9,500 acres it has purchased for this project since January 28, 1936.

But, as previously found from the evidence in this action, the Government paid the aggregate sum of $396,894.79 for said land. Therefore it appears that the Tennessee Valley Authority has paid by voluntary purchase through private negotiations a price which is 20% more than the price basis herein found and fixed for the lands taken by the Tennessee Valley Authority from the Southern States Power Company by this action.

### Severance Damages

In passing upon the question of severance damages, the facts found in the first instance apply with similar force and pertinency to the other properties of the respondents. The whole constitutes the site of an integrated hydroelectric power system. Respondents' matured plans contemplated the erection of a dam 110 feet high on the Hiwassee river at a point in North Carolina near the Tennessee state line which it designated Appalachia dam; a second dam 245 feet high at a point about 12 miles upstream, which it designated Powelson dam; and a third dam 200 feet high at a point about 23 miles still further up said river at the town of Murphy; and a fourth dam, 200 feet high, on the Nottely river, a tributary of the Hiwassee, at a point adjacent to said other dam sites.

On January 28, 1936, the Southern States Power Company had acquired and then owned approximately 22,000 acres of land needed for contemplated development of its proposed integrated hydroelectric power system. It owned approximately 3,220.7 acres of land and a shoal and dam site in North Carolina near the Tennessee line, which it designated as the Appalachia dam, on the Hiwassee river.

1. Of this property the Tennessee Valley Authority by this action has taken 315.9 acres, leaving the respondent, Southern States Power Company, 2,094.84 acres. Since the taking, it is no longer practicable to use said property as the site of a 110-foot dam at Appalachia as contemplated.

2. By this suit the Tennessee Valley Authority has taken approximately 12,679.94 acres, which constitute approximately all of the Powelson dam site and basin, leaving only 316 acres of same.

3. It has likewise taken the dam site and approximately 200 acres, leaving the said respondent 619 acres, in the basin of the Murphy dam site. The shoal has been taken, and it is no longer practicable to

develop the property as a site for a hydroelectric power plant.

4. The Nottely dam site and basin, consisting of 4,297 acres, owned by the Southern States Power Company, is left. The principal function of this dam in the plan of development was to store water during rainy seasons and empty same into the Powelson basin down stream during dry seasons. Since the Powelson dam site and basin have been taken by this action, the function and usefulness of the Nottely dam as a reservoir have been destroyed.

Since the taking of the 12,679.94 acres which included the dam site and basin of the contemplated Powelson dam, it is impossible for the respondent, Southern States Power Company, to use its remaining property as the site of an integrated hydroelectric power system. Its principal dam site and holdings, located in the centre of its property, are taken, and the remainder cannot be developed as an integrated system so that the dam upstream can store water during rainy seasons and release same into the proposed lakes or ponds downstream during dry seasons. The status of all of said property as the site of a four-dam integrated hydroelectric power system has been destroyed, and what is left the respondent, in its remnants of property not taken, has been reduced to the status of farm lands and rough mountain acreage.

Pursuant to the constitutional requirement that "just compensation" be awarded the owner, and after making calculations and findings of damage sustained by the Southern States Power Company by reason of the severance, or the taking of a part of its property by the petitioner, we find the damage sustained by the Southern States Power Company, segregated to its four proposed dam sites in its integrated system, to be as follows:

1. Appalachia dam and basin.............. $83,562.51
2. Powelson "remnant left"................. 1,584.20
3. Murphy .................................... 7,737.50
4. Nottely ................................... 18,907.02

We therefore find and award severance damages of $111,791.23 as being "just compensation" resulting to the Southern States Power Company for the loss in value of its remaining *real estate* by reason of a taking of a part thereof.

### Severance Damages Resulting From the Taking of Murphy Hydroelectric Plant

In 1922–23 the town of Murphy issued $200,000 in bonds with which it constructed a dam on the Nottely river at a point about eight miles from the town. It erected a small hydroelectric generating plant at said dam and built a transmission line from same to Murphy. It also constructed an electric lighting system in Murphy. In 1924 the Southern States Power Company by its predecessor purchased this property from the town of Murphy, paying therefor the sum of $200,000.

After the purchase of said property from the town of Murphy, the Southern States Power Company expanded the electric lighting system in said town to approximately twice its original size. It also built a transmission line from Murphy to Hayesville, the county seat of Clay county, and built an electric lighting system in the town of Hayesville. It also built an electric transmission line to a talc mine and village some 8 miles from Murphy. In the aggregate, the Southern States Power Company owns slightly more than 40 miles of transmission lines. There is but little evidence as to the value of such lines. The Government witnesses testified that transmission lines from their contemplated Hiwassee dam would cost $22,000 per mile, but this cannot be considered as any evidence as to the value of the 40 miles of transmission lines owned by the Southern States Power Company. The sum of $2,000 per mile would be a fair value for said transmission lines, including the fee simple title for rights of way owned by the Southern States Power Company on which same was erected.

The Court finds that the additions made by the Southern States Power Company to its Murphy hydroelectric power development, consisting of—

1. Doubling the size of the Murphy electric lighting system;

2. Erecting 40 miles of transmission lines;

3. Erecting electric lighting system in Hayesville; and

4. Electric lighting project at the talc mine;

are worth the sum of $100,000 after making allowance for depreciation. By adding this amount to the value of the Murphy hydroelectric plant itself, we find the property as a whole to be worth the sum of $300,000.

The Tennessee Valley Authority by this action has taken the Murphy hydroelectric plant, and an award of $110,000 has been

paid for same. The Southern States Power Company is left with the remainder of this enterprise that represents a value of $190,-000 when owned and operated by it as a part of its Murphy hydroelectric plant. The value of the remaining property, separated from the Murphy hydroelectric plant in ownership, is greatly diminished.

The transmission line from the dam to the town of Murphy, a distance of 8 to 10 miles, will necessarily have to be dismantled. Under the new conditions it is evident that the transmission line from Murphy to Hayesville will ultimately be dismantled; and the same will doubtless apply to the line built to the talc mine. If these lines are dismantled, the cost of dismantling same, over the rough mountain territory on which it is situated, will largely absorb its junk value.

The electric light system in Murphy should possess commercial value. Also, the electric light system of Hayesville should retain some value. But since the hydroelectric plant has been taken, and there is no source of supply owned by the Southern States Power Company, the value of said plant has been substantially reduced by the taking. We find this property, after the taking, to be worth $90,000. By adding to the $110,000 award for the Murphy plant the $90,000 value of the remainder of the property, after the taking, the Southern States Power Company is left with cash and property amounting to $200,000 for what was worth $300,000 before the segregation. We therefore find that the severance damage sustained by the Southern States Power Company to its electric lighting system is $100,000.

### Interest

■ The law that requires that "just compensation" shall be paid the owner when his land is taken by condemnation includes the payment of interest as a part of such compensation. The statute reads as follows: "Upon the filing said declaration of taking and of the deposit in the court, to the use of the persons entitled thereto, of the amount of the estimated compensation stated in said declaration, title to the said lands in fee simple absolute, or such less estate or interest therein as is specified in said declaration, shall vest in the United States of America, and said lands shall be deemed to be condemned and taken for the use of the United States, and the right to just compensation * * * shall be as-certained and awarded in said proceeding and established by judgment therein, and the said judgment shall include, as part of the just compensation awarded, interest at the rate of 6 per centum per annum on the amount finally awarded as the value of the property as of the date of taking, from said date to the date of payment; but interest shall not be allowed on so much thereof as shall have been paid into the court. No sum so paid into the court shall not be charged with commissions or pound-age." 40 U.S.C.A. § 258a.

The statutory law of the state of North Carolina likewise fixes the rate of 6 per cent per annum as the legal rate of interest in the state.

The difficulty in the instant case results from the fact that the property of the Southern States Power Company, condemned by this action, was taken by piecemeal, instead of all at once. The property of the Southern States Power Company was taken by the petitioner in five different parcels at five different times and upon making five different deposits of money, as follows:

| Date | Acres Taken | | Money Deposited |
|---|---|---|---|
| January 28, 1936 | 872.6 | | $ 4001.94 |
| October 22, 1936 | 1409.6 | | 8768.92 |
| October 12, 1938 | 605. | | 6326.27 |
| November 21, 1938 | 9355.74 | | 73968.14 |
| Sept. 1939 | 35 | Murphy Electric Power Plant | $ |
| | 12277.94 | | 93065.27 (Total) |

(This acreage does not include the bed of the river.)

At the time of filing the first declaration of taking on January 28, 1936, the Tennessee Valley Authority effectively destroyed the whole scheme of the respondent, Southern States Power Company. The development by the respondent was thereby frustrated and the damage was as complete as at the time of the filing of the last declaration. It was no longer possible for the Southern States Power Company to build an integrated hydroelectric power system as planned by it, with a dam at Appalachia on the Hiwassee river in North Carolina near the Tennessee line 110 feet high, a second dam 245 feet high about 12 miles up the Hiwassee river from same at the Powelson dam site, a third dam 200 feet high on the Hiwassee river near the town of Murphy, and a fourth dam 200 feet high on the Nottely river, as originally

planned and contemplated. Beginning at said date, it was no longer possible for the Southern States Power Company to build and link together four dams in one system, so that the dams upstream would store water in wet seasons and empty same into the dams down stream in dry seasons, and thus function as an integrated system. It has been found by the Court that the 12,287.94 acres of land acquired by said five declarations of taking, on January 28, 1936, valuable as the major unit in the site of an integrated hydroelectric power system.

By the first taking on January 28, 1936, the shoal and Powelson dam site was taken and the entire property of the Southern States Power Company was robbed of the value it possessed as the site of an integrated hydroelectric power system. After taking said 872.6 acres from the total holding of 12,287.94 acres of the respondent, in the Powelson development, the Southern States Power Company was left with 11,-415.34 acres in the basin of the Powelson dam, which has been acquired by the subsequent takings above listed. After the taking of the Powelson dam site and shoal on January 28, 1936, the remaining 11,-415.34 acres no longer possessed any value to the respondent for power purposes, and its value was limited to its adaptability for farming, timber growing, and similar purposes. In its then created status $10 an acre would have been a fair value for same.

The Court has herein found and fixed the value of the total 12,287.94 acres taken by this action, plus the 392 acres contained in the bed of the river, to be $976,289.40. In order to arrive at the sum on which the Southern States Power Company is entitled to interest beginning January 28, 1936, it is ordered that the total award for said land of $976,289.40 be first reduced by $4,001.94, the amount deposited with the Court by the petitioner at the time of taking, and that the remainder of $972,287.46 be further reduced by the value of 11,415.34 acres not taken, at the price of $10 an acre, or the sum of $114,153.40, and that on the remainder of $858,134.06 interest be paid at the rate of 6 per cent per annum from January 28, 1936, until paid.

On October 22, 1936, the petitioner filed its second declaration of taking, by which it acquired 1,409.6 acres of respondent's land, now valued at $10 an acre, or $14,096. At the time of taking same the petitioner deposited the sum of $8,768.92 with the Court, which should be deducted from the $14,096 valuation, and thus leave $5,327.08 on which interest is hereby ordered at the rate of 6 percent per annum from October 22, 1936, until paid. On October 12, 1938, the petitioner filed its third declaration of taking, by which it acquired 605 acres of the lands of the Southern States Power Company, which, at the then value of $10 an acre, was worth $6,050. At the time of said taking the petitioner deposited with the Court $6,326.27. The deposit thus made was $276.27 more than the value of the land thus taken, and it is ordered that the said $276.27 be carried forward as a credit on the lands subsequently taken in the calculation of interest.

On November 21, 1938, the Tennessee Valley Authority took by its fourth declaration of taking 9,355.74 acres of the land belonging to the Southern States Power Company, and in doing so deposited $73,968.14 as compensation therefor, which sum, together with the said $276.27 balance carried over from the previous taking, makes the total sum of $74,244.41 to be applied on the purchase of said land. Calculated at $10 an acre, the 9,355.74 acres are now valued at $93,557.40, from which should be subtracted the said $74,244.41 on deposit, and the balance of $19,312.99 should draw interest at 6 per cent per annum from said November 21, 1938, until paid.

On September, 1939, the petitioner filed its fifth declaration of taking, by which it acquired the 35 acres on which was situated the Murphy Hydroelectric Power Plant, and deposited the sum of $110,000 in court for same. This amount has been accepted and approved by the Court as just compensation for the Murphy Hydroelectric Power Plant, and no interest is to be paid thereon.

### Interest on Severance Damages

The Court has herein found and awarded severance damages of $111,791.23 to the Southern States Power Company as "just compensation" for the loss in the value of its remaining real estate resulting from the taking of its Powelson dam site and basin. This damage accrued on January 28, 1936, the date of the original taking, and it is ordered that interest be paid thereon at 6 per cent per annum from January 28, 1936, until paid. The Court has found and made award of $100,000 as severance damages sustained by the Southern States Power Company by the taking of its Murphy Hydroelectric Power plant by the petitioner on

September, 1939, and it is ordered that interest at the rate of 6 per cent per annum be paid on said $100,000 from September, 1939, until same is paid.

## Summary

■ Pursuant to the findings and awards herein made, it is ordered and adjudged that the Clerk of this Court pay to the Southern States Power Company the sum of $93,065.27, the aggregate of the deposits made with the Court by the petitioner at the time of filing the four separate takings herein described, and that the Southern States Power Company have and recover of the United States of America, upon the relation and for the use of the Tennessee Valley Authority, the sum of $883,224.13, the deficiency of said deposits in paying the final award of $976,289.40 found to be the value of the lands of the Southern States Power Company taken by this action.

It is further ordered and adjudged that the Southern States Power Company have and recover of the United States of America, upon the relation and for the use of the Tennessee Valley Authority, 6 per cent interest per annum upon the sum of $856,134.06 from January 28, 1936, until paid, and interest at 6 per cent per annum upon the sum of $5,327.08 from October 22, 1936, until paid, and interest at 6 per cent per annum on the sum of $19,312.99 from November 21, 1938, until paid.

It is further ordered and adjudged that the Southern States Power Company have and recover of the United States of America, upon the relation and for the use of the Tennessee Valley Authority, judgment in the sum of $211,791.23 as severance damages herein found and awarded by this Court, together with interest at the rate of 6 per cent per annum on the sum of $111,791.23 from January 28, 1936, until paid, and interest at 6 per cent per annum on the balance of $100,000 from September, 1939, until paid.

Both the petitioner and the respondents in open court withdrew all exceptions to that part of the report of the Commissioners which made an award of $110,000 as just compensation for the Murphy Hydroelectric Power Plant, and likewise withdrew all exceptions to the award of the Commissioners for the 82 individual tracts and pieces of property, and the Court therefore approves and adopts said award of $110,000 for the Murphy Hydroelectric Power Plant and confirms the payment thereof already made by the petitioner to the Southern States Power Company. The Court also confirms and adopts the awards made by the Commissioners for the said individual tracts of land and properties as fully set forth in pages 14 and 15 of the printed Report of the Commissioners, on file in this cause, and likewise approves and adopts the allocation of payment of said awards as set forth on page 16 of the printed Report of the Commissioners, on file in this cause. Said awards shall draw interest at 6 per cent per annum from the date of taking, as shown by the pleadings in this cause, until paid.

It is further ordered and adjudged that the fee simple title to all the lands and properties described in the petition of the petitioner, and condemned by this action, has vested and does vest in the United States of America upon the relation and for the use of the Tennessee Valley Authority, and all of said lands and properties are hereby condemned and taken by and for the United States of America upon the relation and for the use of the Tennessee Valley Authority.

We understand that both parties to this suit have satisfactorily arranged for the payment of the Commissioners' allowance, and the stenographers' fees before the Commissioners, and the stenographers' expenses incurred in the hearing before us.

It appears further that no witnesses have proved their attendance before the Clerk in this cause. We therefore adjudge that each side pay its own witnesses for their attendance, both before the Commissioners and before this Court.

It appears that the only expenses incurred in the Clerk's office were incurred by the petitioner, amounting to $41 Clerk's fees, and the U. S. Marshal (for petitioner) in the sum of $278.15. It is adjudged that the petitioner pay these costs, which were incurred by it. No attorney tax fee will be taxed in this action.